IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRALCENTRAL DIVISION

| | |
|---|---|
| WORLD ENTERPRISES; ABM, INC.; SECURITY FUNDING, INC.; STANDARD INDUSTRIES, INC.; C.O.P. COAL DEVELOPMENT COMPANY,<br><br>    Plaintiff,<br>v.<br><br>AQUILA, INC., d/b/a KANSAS CITY POWER AND LIGHT COMPANY and/or KCP&L; GREAT PLAINS ENERGY INCORPORATED; CHRISTOPHER (CHRIS) M. REITZ; DOES 1 through 20,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT<br><br><br>Case No. 2:12-cv-00021-DN<br><br><br>District Judge David Nuffer |

## TABLE OF CONTENTS

Introduction ............................................................................................................................. 2

Standard of Review .................................................................................................................. 3

Undisputed Facts ...................................................................................................................... 3

Disputed Facts .......................................................................................................................... 9

Analysis .................................................................................................................................. 10

  Conversion ..................................................................................................................... 11

  Abuse of Process ............................................................................................................ 14

    Improper purpose ................................................................................................... 14

    Standing ................................................................................................................. 17

  Intentional Interference with Economic Relations ......................................................... 18

    The Element of Intent to Interfere ......................................................................... 18

    The Element of Improper Purpose or Improper Means ......................................... 19

  Stay of Judgment Unnecessary to Preserve Claims Pending Appeal .............................. 23

Order ...................................................................................................................................... 25

## INTRODUCTION

On July 16, 2012, Plaintiffs filed an Amended Complaint[1] making three claims: conversion,[2] abuse of process,[3] and intentional interference with economic relations.[4] On July 19, 2012, Aquila Inc. filed a motion to dismiss[5] on the basis of res judicata. The court entered an order[6] stating that the defendant's motion to dismiss would be treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, pursuant to Rule 12(d). This case arises from and is related to ongoing litigation in *In re C.W. Mining Co.* (the Bankruptcy Case)[7] and its associated adversary proceedings.

The memoranda and evidentiary materials submitted by the parties have been carefully reviewed. Because the issue of Plaintiffs' security interest has been litigated in *In re C.W. Mining Co.* and specifically in the related Adversary Proceeding 09-02047,[8] issue preclusion prevents continued litigation of Plaintiffs' security interest here, and therefore Plaintiffs' claim for conversion must fail. Furthermore, Plaintiffs have failed to provide evidence of more than aggressive tactics by Aquila, and their claims of abuse of process and intentional interference also fail. Therefore, Aquila's motion to dismiss, treated as a motion for summary judgment, is GRANTED.

---

[1] Amended Complaint, docket no. 10, filed July 16, 2012.

[2] *Id.* at 9.

[3] *Id.* at 10.

[4] *Id.* at 14.

[5] Aquila's Motion to Dismiss First Amended Complaint with Prejudice (Motion to Dismiss), docket no. 11, filed July 19, 2012.

[6] Order taking under Advisement Motion to Dismiss, docket no. 15, filed Oct. 27, 2012.

[7] *In re C.W. Mining Company*, Case No. 08-20105 (Bankr. D.Utah).

[8] *In re C.W. Mining Company*, Case No. 08-20105, Adversary Proceeding 09-02047 (Bankr. D.Utah) (Adversary Proceeding 09-02047).

## STANDARD OF REVIEW

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9]  In applying this standard, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[10]  However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[11] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[12]

## UNDISPUTED FACTS

1.     C.W. Mining Company (CWM) was the operator of the Bear Canyon Mine in Emery County, Utah, owned by Plaintiff C.O.P. Coal Development Company, a Utah corporation (COP).[13]

2.     COP leased the Bear Canyon Mine mineral rights to CWM under terms requiring CWM to pay COP royalties for the coal CWM produced.[14]

3.     Plaintiffs World Enterprises, ABM, and Security Funding are all Nevada corporations with principal places of business in Utah.[15]

---

[9] Fed. R. Civ. P. 56(a).

[10] *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[11] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008).

[12] *Anderson*, 447 U.S. at 248.

[13] Amended Complaint ¶¶ 5, 13.

[14] *Id.* ¶ 13.

[15] *Id.* ¶¶ 1–3.

4. These plaintiffs are creditors of CWM, having loaned CWM money to implement major capital improvements.[16]

5. Plaintiff Standard Industries, Inc. (Standard) is a Nevada Corporation with its principal place of business in Utah.[17]

6. Standard made written and oral agreements with CWM to buy and pay in advance for coal that CWM had not yet produced as another means for CWM to raise money.[18]

7. Standard also served as CWM's exclusive broker for coal, and CWM had assigned to Standard all amounts payable to CWM for the sale of coal.[19]

8. As security for its debts, CWM granted all of the plaintiffs (COP, World Enterprises, ABM, Security Funding, and Standard) (Creditors) a security interest in all of CWM's assets, supposedly perfected by the filing of UCC-1 financing statements with the Utah Division of Corporations and Uniform Commercial Code.[20]

9. In the later Adversary Proceeding No. 09-02047, the bankruptcy court found that the UCC-1 financing statements were improperly executed, leaving Creditors without a security interest.[21]

---

[16] *Id.* ¶ 14.

[17] *Id.* ¶ 4.

[18] *Id.* ¶ 14.

[19] *Id.* ¶ 15.

[20] *Id.* ¶ 16.

[21] Memorandum Decision Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens (Order in Adversary Proceeding 09-02047) at 15, in Adversary Proceeding 09-02047, document no. 194, filed Aug. 24, 2009.

10.     CWM's debts to Creditors include at least the following: greater than $6 million to World Enterprises, greater than $5 million to ABM, greater than $3 million to Security Funding, greater than $10 million to Standard, and greater than $4 million to COP.[22]

11.     Aquila is a Delaware corporation with its principal place of business in Kansas City, Missouri, providing utility service to several central states.[23]

12.     On September 16, 2003, Aquila contracted with CWM to buy coal for two of its coal-fired power plants in Missouri.[24]

13.     During the performance of this contract, CWM failed to deliver the required quantity and quality of coal.[25]

14.     Aquila sued CWM for damages on this breach of contract in the district of Utah, and on October 30, 2007, Judge Campbell ordered judgment for Aquila in the amount of $24,841,988 (the 2005 Case).[26]

15.     Aquila's judgment award against CWM was affirmed by the Tenth Circuit.[27]

16.     To collect its judgment, Aquila garnished CWM bank accounts and served writs of garnishment on companies with coal purchasing contracts with CWM, including Tennessee Valley Authority (TVA) and UtanAmerian Energy, Inc. (UEI).[28]

---

[22] Amended Complaint ¶ 17.

[23] *Id.* ¶ 6.

[24] Amended Findings of Fact and Conclusion of Law at 2, in *Aquila, Inc. v. C.W. Mining Co.*, Case No. 2:05-cv-555 TC (the 2005 Case), document no. 115, filed Oct. 30, 2007.

[25] *Id.*

[26] *Id.* at 15; Memorandum in Support of Aquila's Motion to Dismiss First Amended Complaint with Prejudice (Memorandum in Support) at 5, docket no. 12, filed July 19, 2012; Judgment in the 2005 Case, document no. 116, filed Oct. 30, 2007; also attached as exhibit A to Memorandum in Support, docket no. 12-1; Amended Complaint ¶ 18.

[27] *Aquila, Inc. v. C.W. Mining Co.*, 545 F.3d 1258, 1269 (10th Cir. 2008).

[28] Amended Complaint ¶¶ 20–22.

17.     CWM's contract with UEI acknowledged that UEI should pay Standard.[29]

18.     Standard alleges that it had already paid CWM for the coal sold to UEI and that CWM had assigned the proceeds to Standard.[30]

19.     On January 3, 2008, Defendant Christopher M. Reitz, general counsel and senior vice president of Aquila, came to Utah for settlement discussions with CWM, and Creditors attended the discussions.[31]

20.     CWM requested leniency in Aquila's judgment collection so that CMW would have the needed funds to make its longwall mining system fully operational, giving CWM the ability to pay Aquila in full.[32]

21.     Reitz explained that collecting the judgment was not Aquila's goal, and neither the cost nor CWM's potential failure was an important consideration for Aquila.[33]

22.     Defendant Reitz stated that Aquila's shareholders "had already been made whole through a rate adjustment that would pay Aquila the amount of its judgment against CWM."[34]

23.     Furthermore, Defendant Reitz stated that Aquila's purpose was "looking aggressive in the eyes of its shareholders and the Public Service Commission."[35]

24.     Defendant Reitz demanded that part of the coal sale proceeds from TVA be paid to Aquila as a condition for Aquila's cooperation in releasing the writs of garnishment.[36]

---

[29] *Id.* ¶ 22.

[30] *Id.*

[31] *Id.* ¶ 24.

[32] *Id.* ¶ 25.

[33] *Id.* ¶ 26.

[34] *Id.*

[35] *Id.*

[36] *Id.* ¶ 27.

25.     Standard claims ownership of the coal sale proceeds from TVA.[37]

26.     Mr. Reitz demanded that CWM's other creditors pay substantial amounts to Aquila on its judgment against CWM as a condition for Aquila's release of its writs of garnishment.[38]

27.     The parties attempted but failed to negotiate terms under which Aquila would release its writs of garnishment and return the garnished funds.[39]

28.     On January 8, 2008, Aquila took part in filing an involuntary Chapter 11 bankruptcy petition against CWM.[40]

29.     The Bankruptcy Court entered an order for relief on the involuntary bankruptcy petitions pursuant to Aquila's motion for summary judgment.[41]

30.     The Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling;[42] the Tenth Circuit reviewed the matter and remanded the case with instructions to dismiss the appeal;[43] and the United States Supreme Court denied a petition for a writ of certiorari.[44]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Amended Complaint ¶ 28. *See* Notice of Involuntary Bankruptcy Case Against C.W. Mining Company by Aquila in the 2005 Case, document no. 171, filed Jan. 10, 2008.

[41] See Order Granting Motion for Partial Summary Judgment, filed in the Bankruptcy Case as document no. 192, Sep. 17, 2008.

[42] *C.W. Mining Co. v. Aquila, Inc.* (In re C.W. Mining Co.), 636 F.3d 1257, 1259 (10th Cir. 2011) (stating that the Bankruptcy Appellate Panel had affirmed).

[43] *Id.* at 1266.

[44] *C.W. Mining Co. v. Aquila, Inc.*, 132 S.Ct. 104 (2011).

31.     After the bankruptcy filing, Standard asked the court, in the 2005 case, to quash Aquila's writs of garnishment.[45]  The court ruled that the Bankruptcy Court was "the proper forum for the relief sought" by Standard.[46]

32.     Standard's first invoice under the UEI contract was not due until January 27, 2008, nearly three weeks after the filing of the involuntary bankruptcy,[47] but Aquila garnished CWM's UEI receivable bank account on January 2, 2008,[48] taking $275,000.[49]

33.     UEI filed an interpleader action in the Bankruptcy Case, seeking a declaration as to who was entitled to the funds owed by UEI,[50] and the Bankruptcy Court ruled that the funds should be paid to the estate of the Debtor, and ordered that the interpleaded funds be paid to the Trustee.[51]

34.     The bankruptcy proceeding caused CWM to default on its obligations to Creditors because CWM was unable to continue mining operations and eventually went out of business.[52]

35.     Creditors state an entitlement to relief from Aquila in "an aggregate amount exceeding $29 million, plus late fees, penalties, collection costs and interest pursuant to

---

[45] Memorandum in Support at 6; Motion to Quash Garnishments, filed in the 2005 Case as document no. 162, Jan. 7, 2008.  Judge Nuffer was the referred magistrate judge on the 2005 case.

[46] Memorandum in Support at 6; Order Taking Under Advisement Motion to Quash Garnishments and Motion to Quash Subpoena in the 2005 case, document no. 174, filed Jan. 14, 2008; also attached as exhibit C to Memorandum in Support, docket no. 12-3, filed July 19, 2012.

[47] Amended Complaint ¶ 30.

[48] *Id. ¶* 22.

[49] *Id.* ¶ 30.

[50] Memorandum in Support at 7.

[51] *Id. See also* Order: (1) Certifying Avoidance Order as a Final Judgment Under Fed. R. Bankr. P. 7054 and Fed. R. Civ. P. 54(b) and (2) Ordering Court Clerk to Pay UEI Receivable Proceeds to Trustee without Delay, in Adversary Proceeding 09-02047, document no. 238, filed July 2, 2010; also attached as exhibit E to Memorandum in Support, docket no. 12-5, filed July 19, 2012..

[52] Amended Complaint ¶¶ 37, 69.

[Creditors]' various contracts,"[53] while Standard claims entitlement "in an amount equal to all lost future profits Standard would have made form brokering coal mined by CWM, in an amount that has not been fully calculated but whose present value is presently believed to exceed $50 million."[54]

## DISPUTED FACTS

There are two potentially disputed facts, but they are not material. First, the complaint alleges "Aquila violated the automatic stay by refusing to return any garnished property, by refusing to release its writs, and by using the writs to exercise control over property and interests subject to the automatic stay."[55] However, in its Motion to Dismiss, Aquila stated that it timely turned over all garnished funds in its possession to Kenneth A. Rushton, the Chapter 7 Trustee in the Bankruptcy Case.[56]

The parties appear to discuss two distinctly different time frames. Creditors aver in the complaint that Aquila did not return funds to them upon demand, which is true, and Aquila points out that it did return the garnished funds to the debtor's trustee during the resolution of the involuntary bankruptcy. The discrepancy merely reveals the issue of property interest in these funds, an issue that was resolved by the bankruptcy court. Aquila was not required to return garnished funds to Creditors before the bankruptcy court decided which parties owned the property interests. Therefore this potentially disputed fact is not material.

---

[53] *Id.* ¶ 71.

[54] *Id.* ¶ 72.

[55] Amended Complaint ¶ 34.

[56] Reply Memorandum in Support of Aquila's Motion to Dismiss First Amended Complaint with Prejudice (Reply Memorandum in Support) at 4, docket no. 14, filed Aug. 10, 2012.

Second, in regard to the UEI proceeds, Creditors state that "Aquila refused to allow the UEI proceeds to be paid directly to CWM,"[57] and "on information and belief, Aquila would agree only that the fun[d]s be paid not to CWM, but to the Clerk of Court."[58] Aquila responds that it attempted to have the funds from the Bank of Utah account be paid to the debtor, but Creditors objected.[59] The minute entry for that hearing supports Aquila's account:

> Mr. Kelly [representing Aquila] also moved that the current garnished funds be paid to CW Mining or to the attorney of CW Mining to avoid business closure. Discussion heard on the TVA garnishment(s) and responses. Mr. Hansen [representing Standard] responded, stating the objection for the record.[60]

Creditors' allegation that Aquila refused to return the UEI funds to the debtor is not supported. Creditors objected to an attempt to make the return they now complain never occurred. Although, the parties' dispute this fact in their filings, the record in the 2005 Case is clear.

## ANALYSIS

Creditors have asserted three claims in their Amended Complaint against Aquila, Inc. for its actions subsequent to an involuntary bankruptcy against debtor and contractor C.W. Mining Company: conversion,[61] abuse of process,[62] and intentional interference with economic relations.[63] All claims arise out of Aquila's garnishment of the debtor's funds and other assets

---

[57] Amended Complaint ¶ 32.

[58] *Id.* ¶ 36.

[59] Memorandum in Support at 6.

[60] Minute Entry for Proceedings Held Before Magistrate Judge David Nuffer, in the 2005 Case, document no. 160, filed Jan. 30, 2008; also attached as exhibit B to Memorandum in Support, docket no. 12-2, filed July 19, 2012.

[61] Amended Complaint at 9–10.

[62] *Id.* at 10–14.

[63] *Id.* at 14–15.

after the filing of involuntary bankruptcy as Aquila sought to collect a $24 million judgment for breach of contract obtained before the filing of involuntary bankruptcy.

Aquila seeks summary judgment, asserting that Creditors' claims are barred by the doctrine of res judicata, having already been decided by other courts. There is no dispute that other courts have or are currently considering issues relevant to this case. This supports Aquila's argument. However, Creditors argue that these claims have not been fully litigated and that the decisions of other courts are not yet final while they are under appellate review, and therefore, summary judgment is not proper.

### Conversion

Creditors' first claim against Aquila is conversion.[64] Under Utah law conversion "'is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.'"[65] Creditors assert that Aquila used writs of garnishment to tie up coal sale proceeds to which CWM and or Standard had right of immediate possession, in violation of the automatic bankruptcy stay,[66] and that Aquila's garnishment of $275,000 from CWM's UEI receivable bank account constitutes a conversion of Standard's property interest in the UEI proceeds.[67] However, the bankruptcy court already decided this issue on February 2, 2010 when it ruled that "any proceeds from the sale of Post-petition Coal mined by the Debtor are free and clear of any security interest claimed by Standard or the other Lenders."[68]

---

[64] Amended Complaint at 9–10.

[65] *Mumford v. ITT Commercial Fin. Corp.*, 858 P.2d 1041, 1045 n.5 (Utah Ct. App. 1993) (*quoting Allred v. Hinckley*, 328 P.2d 726 (Utah 1958)).

[66] Amended Complaint ¶ 40.

[67] *Id.* ¶¶ 39, 42.

[68] Order in Adversary Proceeding No. 09-02047 at 6.

Creditors appealed the bankruptcy ruling to the district court before Judge Stewart.[69]  On March 8, 2013, Judge Stewart affirmed the bankruptcy court in the Bankruptcy Appeal, finding that Creditors had not perfected a security interest in the UEI funds.[70]  Judge Stewart reversed and remanded the bankruptcy court's determination on other grounds,[71] but the district court's decision provides another final ruling on the salient issues in this case, again barring Creditors' claims.  However, Creditors filed an appeal with the Tenth Circuit on April 11, 2013,[72] and CWM's trustee filed a cross appeal on April 25, 2013.[73]

Aquila argues that the bankruptcy court ruling is final and res judicata applies to bar relitigation of those claims, regardless of the pendency of an appeal.[74]  Creditors originally argued that "numerous Courts around the country have held that res judicata does not apply until the appeal has been adjudicated."[75]  Creditors "encourage the Court to adopt the better reasoned approach adopted by [those courts].  Applying res judicata, in this case, while appeals are pending, could potential[ly] foreclose [Creditors]' legitimate claims."[76]

---

[69] *Standard Indus. v. ANR*, Case No. 2:10-cv-00271-TS (the Bankruptcy Appeal).

[70] Memorandum Decision and Order on Combined Appeal, filed in the Bankruptcy Appeal as document no. 47, Mar. 8, 2013.

[71] *Id*.

[72] USCA case no. 13-4075. *See* Notice of Appeal, filed in the Bankruptcy Appeal as document no. 49, Apr. 11, 2013.

[73] Notice of Cross Appeal, filed in the Bankruptcy Appeal as document no. 53, Apr. 25, 2013.

[74] Memorandum in Support at 11.

[75] Supplemental Memorandum in Opposition to Aquila's Motion  to Dismiss (Supplemental Memorandum in Opposition) at 4–5, docket no. 16, filed Nov. 9, 2012 (citing *In re Med. Educ. & Health Servs., Inc.,* 474 B.R. 44 (D.P.R. 2012) (finding that a Court decision does not constitute res judicata until the appeal process is final and unappealable)); *Caperton v. A.T. Massey Coal Co., Inc.*, 679 S.E.2d 223 (W.Va. 2008) (explaining that under Virginia law, a judgment is not final for the purposes of res judicata when it is being appealed, or when the time limits fixed for perfecting the appeal have not expired).

[76] Supplemental Memorandum in Opposition at 4–5.

Creditors' argument concerning the application of res judicata during the pendency of appeal is therefore not per se mooted.  However, Creditor' cited cases from the district court in Puerto Rico and the state court in West Virginia do not constitute a "better reasoned approach" by "numerous courts around the country" as Creditors suggest.[77]  The cases cited relied on Puerto Rico and West Virginia law, not on federal law.

The Sixth and Ninth Circuits hold that an order retains full res judicata effect unless and until it is overturned on appeal.[78]  The Federal Circuit has described a "vast weight of case law" including "case law from the Supreme Court and from the Second, Fifth, Sixth, Seventh, Ninth, Eleventh, District of Columbia and Federal circuits for the proposition that a final judgment retains its preclusive effect despite the pendency of an appeal."[79]  Specifically governing this court, the Tenth Circuit held in *Phelps v. Hamilton*[80] that an "established rule in federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal."[81]

The ownership of coal and coal proceeds in this case has already been decided by the bankruptcy court, and that decision was affirmed on appeal to the district court since the filing of these motions.  Those rulings are final until they are modified on direct appeal.  Res judicata bars Creditors from re-litigating the fact that they have no proprietorship interest in the proceeds in

---

[77] *See id.*

[78] *See, e.g.*, *Erebia v. Chrysler Plastics Prods. Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989) ("[T]he established rule in the federal courts is that a final judgment retains all of its preclusive effect pending appeal."); *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988) (the preclusive effects of a judgment are not suspended by taking an appeal).

[79] *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1381 (Fed. Cir. 1999) (citing *SSIH Equipment S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983)).

[80] 122 F.3d 1309 (10th Cir. 1997).

[81] *Id.* at 1318.

question, and they cannot satisfy the entitlement element of a conversion claim. Creditors' claim for conversion fails and Aquila is entitled to judgment as a matter of law.

## Abuse of Process

Creditors' second claim for relief is abuse of process.[82] "A claim for abuse of process requires the plaintiff to show (1) that the defendant used legal process, (2) to accomplish an improper purpose or purpose for which that process was not designed, (3) causing the plaintiff's harm."[83] The use of legal process is not in doubt here, but Creditors have failed to allege sufficient facts to meet the requirement "to produce evidence that the defendant's action caused injury to the plaintiff."[84] Furthermore, that causal relationship is too attenuated or incidental even if facts alleged had been sufficient. However, the Creditors' claim fails on the second element because they cannot show improper purpose. Creditors are correct that improper purpose has never been addressed in litigation,[85] so res judicata does not bar this claim.

### Improper purpose

As proof of Aquila's alleged improper purpose or purpose for which the legal process was not designed, Creditors recite the contents of settlement discussions that took place on January 3, 2008 between CWM, Creditors, and defendant Christopher M. Reitz, general counsel and senior vice president of Aquila.[86] In these discussions, Reitz explained that Aquila's goal in pursuing the CWM's judgment debt was not just collecting that debt because Aquila's

---

[82] Amended Complaint at 10–14.

[83] *Mountain West Surgical Ctr., L.L.C. v. Hosp. Corp. of Utah*, 173 P.3d 1276, 1278 (Utah 2007).

[84] *Id.*

[85] Memorandum in Opposition to Aquila's Motion to Dismiss (Memorandum in Opposition) at 8, docket no. 13, filed Aug. 6, 2012.

[86] Amended Complaint ¶ 24.

shareholders had already recovered the judgment amount through rate adjustments.[87]  According

to Creditors, "Reitz stated that Aquila's purpose was "looking aggressive in the eyes of its

shareholders and the Public Service Commission."[88]

Creditors argue that Aquila's use of the process of levying writs of garnishment was not

to collect on its judgment against the debtor, but to appear aggressive,[89] and that "demonstrate[s]

that Aquila used the legal process for an improper purpose.[90]  Creditors allege that Aquila used

improper purposes

> to give Aquila leverage over C.W. Mining and secured creditors to put pressure on
> C.W. Mining and secured creditors to pay Aquila money to which Aquila had no
> claim, to extort payments to which Aquila was not entitled, to give Aquila more
> favorable treatment than Aquila was entitled to as an unsecured creditor, and to make
> it impossible for C.W. Mining to implement a workable Chapter 11 reorganization
> plan.[91]

In response, Aquila argues that these statements cannot form the basis of an abuse of

process claim because "the comments were made in the course of a confidential settlement

negotiation and are inadmissible as evidence in this case."[92]  This is correct.  The Federal Rules

of Evidence expressly provide:

> (a) Prohibited Uses.  Evidence of the following is not admissible – on behalf of
> any party – either to prove or disprove the validity or amount of a disputed
> claim or to impeach by a prior inconsistent statement or a contradiction:
>> (1) Furnishing, promising, or offering – or accepting, promising to
>> accept, or offering to accept – a valuable consideration in
>> compromising or attempting to compromise the claim; and
>> (2) Conduct or a statement made during compromise negotiations
>> about the claim – except when offered in a criminal case and when

---

[87] *Id.* ¶¶ 32–33.

[88] *Id.* ¶ 26.

[89] Memorandum in Opposition at 8.

[90] *Id.*

[91] *Id.* at 8–9.

[92] Reply Memorandum in Support at 8.

> the negotiations related to a claim by a public office in the exercise
> of its regulatory, investigative, or enforcement authority.[93]

Creditors offer statements from settlement negotiations to support their claims, which is directly prohibited by the rules of evidence. Creditors carry the burden of proving the elements of their claims beyond a preponderance of the evidence, and "[Creditors] bear the risk of failing to prove their claims."[94] Barred evidence cannot support the claim.

Even assuming, *arguendo*, that the statements were admitted into evidence and the trier of fact had the opportunity to consider them, they do not form a basis for a claim of abuse of process. As Aquila argued, an aggressive position and harsh demands during settlement negotiations "illustrate at most that Aquila was intent on aggressively collecting its money despite any impact that its collection efforts might have on the Debtor's future business."[95] The purpose behind Aquila's actions was to collect its $25 million judgment against CWM. Creditors do not disagree that Aquila's goal was collection of its judgment, but they contend that the underlying motivation behind that purpose wasn't proper.

A prevailing party is entitled to collect on an awarded judgment. Furthermore, Creditors cite no authority requiring the court to verify or even consider the virtue of every layer of motivation underlying Aquila's purpose of collecting its judgment. Assuming that Aquila's motivation was to appear aggressive, it would accomplish that goal by collecting its judgment, the purpose for Aquila's actions.

Even if the motivation behind Aquila's purpose was to put CWM out of business, the element of improper purpose would still not be satisfied. Indeed, "there is no action for abuse of

---

[93] Fed. R. Evid. 408(a).

[94] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

[95] Memorandum in Support at 13.

process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."[96]  Furthermore, the Utah Supreme Court has agreed with a ruling of this court that "'even a pure spite motive is not sufficient to state a claim for abuse of process where process is used only to accomplish the result for which it was created.'"[97]  It is immaterial whether Aquila wanted to collect the judgment to recuperate funds, appear aggressive, or for any other possible reason.  "The fact that certain consequences flowed from [defendant's actions] . . .  is not sufficient to state a cause of action for abuse of process."[98]

**Standing**

Aquila claims that Creditors lack standing to argue abuse of process because Aquila did not owe Creditors or any other party a duty to ensure that C.W. Mining did not go out of business.[99]

> Aquila's actions were directed toward the Debtor and not Creditors. Creditors therefore lack standing to pursue an abuse-of-process claim because any harm to them was merely tangential, and it was no different than the harm caused to multiple creditors every time a company cannot pay its bill and goes out of business or into bankruptcy.[100]

Creditors do not address this lack of standing argument.  This argument is another reason this claim fails.

---

[96] *Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 29 (Utah 2003) (quoting Restatement (Second) of Torts § 682 cmt. b (1977)).

[97] *Id.* (quoting *Keller v. Ray, Quinney & Nebeker*, 896 F.Supp. 1563, 1572 (D. Utah 1995)).

[98] *Id.*

[99] Reply Memorandum in Support at 7–8.

[100] Memorandum in Support at 13.

## Intentional Interference with Economic Relations

Creditors' third claim for relief is intentional interference with economic relations.[101] "To establish the tort a plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[102]

Creditors were injured by the closure of CWM, thereby eliminating the possibility of payment of the debts owed to them. However, even if the court assumes that all of Creditors' facts are true, they are not sufficient to prove the elements of the tort. Specifically, those facts do not establish that Aquila's use of writs of garnishment against CWM funds or the commencement of the involuntary bankruptcy (1) reveal an intent to interfere with Creditors' business relations under the first element of the tort, (2) show Aquila acted with an improper purpose or that its actions constitute improper means under the second element, or (3) establish that Aquila's actions were the cause of Creditors' injuries under the third element.

### The Element of Intent to Interfere

Creditors' claim of intentional interference with economic relations falters on the first element because Creditors have not stated facts showing that Aquila intentionally interfered in Creditors' economic relations. In *Leigh Furniture and Carpet Co. v. Isom*,[103] the Utah Supreme Court held that an accumulation of individual interferences, aimed directly at the plaintiff's business, crossed the threshold of tortious conduct, although they would individually be regarded merely as overly zealous attempts to protect a seller's contract interest and "none would establish

---

[101] Amended Complaint at 14–15.

[102] *Mountain West Surgical Ctr., L.L.C.* 173 P.3d at 1278 (internal quotations omitted).

[103] 657 P.2d 293 (Utah 1982).

the intentional interference element of this tort."[104]   In that case, the court described the actions

as:

> aggressive or abrasive–though not illegal or tortious–tactics, excesses that occur
> in contractual and commercial relationships.  But in total and in cumulative effect,
> as a course of action extending over a period of three and one-half years and
> culminating in the failure of [plaintiff's] business, [defendant's] acts cross the
> threshold beyond what is incidental and justifiable to what is tortious.[105]

In this case, Aquila's actions had no total or cumulative effect, and they did not extend

over a long period.  Creditors state "that Aquila used conversion, abuse of process and violations

of bankruptcy law, including violations of the automatic stay . . . ."[106]  The claims for conversion

and abuse of process have been dismissed in this order, and the underlying actions cannot form a

basis for the element of intentional interference with economic relations because they are

singular instances of "aggressive or abrasive–though not illegal or tortious–tactics."[107]  In *Leigh

Furniture* the defendant individually and directly interfered in repeated events with the plaintiff's

business for over more than three years.  Aquila attempted to collect its judgment debt against a

non-party, CWM, without any direct interference against Creditors, and did not engage in

numerous actions over many years.

**The Element of Improper Purpose or Improper Means**

Creditors cannot prevail on the second element of the interference claim because they

have not shown that Aquila acted with either improper means or with an improper purpose.[108]

"To establish the first alternative, improper purpose, it is not enough to show that the defendant

---

[104] *Id.* at 306.

[105] *Id.*

[106] Memorandum in Opposition at 6.

[107] *Leigh Furniture and Carpet Co.*, 657 P.2d at 306.

[108] *See Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005) (stating only one alternative is required, a
plaintiff need not prove both).

was motivated by ill will toward the plaintiff.  Rather, the plaintiff must show that the defendant's predominant purpose was to injure the plaintiff."[109]  The analysis of improper purpose under the abuse of process claim in the previous section of this order applies here as well.  Therefore, Creditors' claim cannot stand on any allegations of improper purpose.

The alternative on this prong of the analysis, improper means, fares no better.  To establish the second alternative, improper means, a plaintiff must show "that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession."[110]  Creditors allege that Aquila used improper means by (1) violating the automatic stay in violation of bankruptcy law[111] and (2) improperly serving writs of garnishment on TVA.

(1) Violation of the Bankruptcy Stay as Improper Means

First, whether Aquila violated the automatic stay is a question for the bankruptcy court in which Creditors had full opportunity to raise this issue.  Because Creditors never raised the issue, the bankruptcy court made no rulings pertaining to Aquila and the automatic stay, and this court is not the proper forum to address issues neither party raised during the bankruptcy proceedings.  Earlier in the 2005 case, on Standard's motion to quash Aquila's writs of garnishment, the court told the parties that "the bankruptcy court is the proper forum for the relief sought by the present motions."[112]  Indeed, other courts have held that "the proper forum for a claim for damages arising out of an alleged breach of the automatic stay provision is the bankruptcy court, not the

---

[109] *Id.*

[110] *Id*.

[111] Memorandum in Opposition at 6.

[112] Order Taking Under Advisement Motion to Quash Garnishment and Motion to Quash Subpoena, in the 2005 Case, document no. 174, filed January 14, 2008; also attached as exhibit C to Memorandum in Support, docket no. 12-3, filed July 19, 2012.

district court."[113] This court has not altered its position, and it is improper for Creditors to file another lawsuit to claim the same injuries that they were previously instructed to address in the bankruptcy court.

Creditors stated from the outset that these claims depend on the bankruptcy court's rulings pertaining to violations of the automatic stay, but offer no orders or findings from that court to support their claims. Creditors have not disputed Aquila's argument that this court is not the proper forum to determine breach of the bankruptcy stay. Moreover, they admit in the Amended Complaint that this is not the proper forum to determine whether a party violated the automatic stay: "While [Creditors] believe that Aquila has violated the automatic stay . . . [they assert] these claims to preserve such claims in the event that the bankruptcy court finds Aquila violated the automatic stay related to the conduct asserted herein."[114]

Aquila points out that Standard and COP were held in contempt in the bankruptcy proceeding for violating the automatic stay.[115] This carries little weight in determining whether *Aquila* violated the automatic stay but emphasizes that the bankruptcy court is the proper forum. Creditors had the opportunity to argue in the bankruptcy court that Aquila violated the automatic stay when the same was argued against them. Whether Creditors directly assert a claim for a violation of the stay itself, or assert that a violation of the stay constitutes an improper means under a tort claim, the underlying question of the violation of the stay is one for the Bankruptcy

---

[113] *See G.B. "Boots Smith" Corp. v. United States*, No. 2:05mc113KS-MTP, 2006 WL 2708593, at *2 (S.D. Miss. Sept. 20, 2006).

[114] Amended Complaint ¶ 68.

[115] *See* Order of Civil Contempt Against Standard Industries, Inc. and C.O.P. Coal Development Company for Violations of the Automatic Stay, in the Bankruptcy Case, document no. 98, filed July 23, 2008; also attached as exhibit A to Reply Memorandum in Support, docket no. 14-1, filed Aug. 10, 2012.

Court, and that court has never held that Aquila violated the automatic stay.[116]  Therefore,

Creditors cannot argue that Aquila's actions in relation to the automatic stay constitute an

improper means without any finding from the Bankruptcy Court that Aquila's actions violated

the stay.

(2)       Aquila's Writs of Garnishment as Improper Means

Creditors' last remaining argument that could satisfy the element of improper means is

the allegation that Aquila improperly served writs of garnishment on (a) the UEI funds and (b)

TVA after the commencement of the involuntary bankruptcy.  Aquila responds that both issues

are barred by *res judicata*.

a)       Aquila's Writs on the UEI Funds are not Improper Means

Aquila's writ of garnishment against the UEI funds was adjudicated by the bankruptcy

court in Adversary Proceeding No. 09-02047, and Creditors acknowledge that the decision is

final.[117]  The bankruptcy court found that the Creditors had not perfected a security interest in

the UEI funds taken by Aquila, and the funds were paid back to the debtor's trustee.  The

bankruptcy court did not find that Aquila's writs of garnishment violated bankruptcy law, but it

did not find that Aquila's wits were proper either.  Therefore, Aquila's uses of writs of

garnishment might constitute "means of interference [that] were contrary to statutory, regulatory,

or common law or violated an established standard of a trade or profession."[118]

However, a claim for interference with economic relations based solely on Aquila's writ

of garnishment against the UEI funds would fail on the other two elements of the tort.  Aquila

---

[116] *See* Reply Memorandum in Support at 4–5.

[117] Memorandum in Opposition at 7.

[118] *Anderson Dev. Co.*, 116 P.3d at 331.

was collecting a judgment debt that did not directly involve Creditors.[119]  And Aquila did not injure Creditors with the UEI garnishments because Creditors had no immediate right to the funds, and because the writs were employed after the commencement of the bankruptcy.  The bankruptcy prevented Creditors from immediately collecting funds even if they had a security interest.

>     b)     Aquila's Writs against TVA are not Improper Means

Aquila's writs of garnishment against TVA have not been as thoroughly addressed by the Bankruptcy Court as it addressed the UEI funds, and therefore *res judicata* does not bar litigation of the issue of the TVA garnishments.

Creditors have offered no set of facts that support a claim that Aquila's actions regarding TVA actually injured them, and there is no suggestion that the writs of garnishment were used with the intention of interfering with Creditors' economic relations.  "TVA did not comply with the writ of garnishment that was obtained by Aquila from this Court.  Rather, the TVA paid millions of dollars to Standard."[120]  Furthermore, Aquila alleges that "Standard has never complied with the Bankruptcy Court's order.  Specifically, it has not paid the TVA money to the bankruptcy estate of C.W. Mining, and it has not provided the Bankruptcy Court and Aquila with the accounting that the Bankruptcy Court ordered."[121]

Therefore, Aquila is entitled to judgment as a matter of law.

**Stay of Judgment Unnecessary to Preserve Claims Pending Appeal**

In responding to the original motion to dismiss, Creditors requested that if the court dismissed their claims, it should dismiss the claims without prejudice allowing the possibility of

---

[119] *See* Judgment in the 2005 Case, document no. 116, filed Oct. 20, 2007.

[120] Reply to Supplemental Memorandum at 3, docket no. 17, filed Nov. 19, 2012.

[121] Reply Memorandum in Support at 6.

refilling in the future.[122]  Creditors argued that the issue of their security interest was on appeal before the Tenth Circuit,[123] and a final ruling on that appeal may alter the outcome of Creditors' claims before this Court.

Creditors explain their filing of these claims before they were fully adjudicated in the bankruptcy court by arguing that had they waited for final judgment, "Aquila would have surely argued that [Creditors]' claims were barred by the applicable statutes of limitation.  As such, it was necessary to file the Complaint in a timely manner."[124]  Creditors state their purpose in filing these claims now is "to protect and preserve claims, which may or may not be affected by future court hearings, determinations, and orders . . . [because] Defendants would not agree to a tolling agreement or other method to hold this case in abeyance pending resolution of the bankruptcy issues."[125]  Aquila responds that Creditors, disappointed by adverse rulings, are merely seeking to relitigate in this court issues that have already been decided.[126]

This is not a case of simple relitigation but further litigation partially relying on other issues still pending litigation.  There are final judgments that preclude the litigation of some issues in this case.  An appeal could alter the outcome of this case, and given the amounts in controversy, Creditors may have grounds in the future to prevail on some of their claims.  If the Tenth Circuit reversed lower court rulings, Creditors could move for relief from this grant of

---

[122] Memorandum in Opposition at 9–10.

[123] *Standard Industries et al. v. ANR et al.*, case no. 13-4055 (10th Cir.) (appeal); *Standard Industries et al. v. ANR et al.*, case no. 13-4075 (10th Cir.) (cross-appeal by Kenneth Ruston).  The Tenth Circuit dismissed the appeal and cross-appeal for lack of jurisdiction because the district court's decision ordered a remand to the bankruptcy court for further proceedings.  "In light of the proceedings to be conducted on remand in this matter, the court concludes that the district court's decision is not final and appealable."  Order at 3, Mandate of USCA, document no. 60 in the Bankruptcy Appeal, filed July 22, 2013.

[124] Supplemental Memorandum in Opposition at 5.

[125] Amended Complaint at 2.

[126] Memorandum in Support at 3.

summary judgment pursuant to Federal Rules of Civil Procedure 60(b)(5) which allows for relief from a judgment "based on an earlier judgment that has been reversed or vacated."[127]  There is no reason to stay judgment pending appeal.

## ORDER

IT IS HEREBY ORDERED that Aquila's Motion to Dismiss,[128] treated as a motion for summary judgment, is GRANTED.  The clerk is directed to close this case.


Signed August 28, 2013.


BY THE COURT

District Judge David Nuffer

---

[127] Fed. R. Civ. P. 60(b)(5).

[128] Motion to Dismiss, docket no. 11, filed July 19, 2012.